UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LEONARDO VILLEGAS-SARABIA and LEONARDO VILLEGAS, JR., | § | CV. NO. 5:15-CV-122-DAE |
| | § | |
| Petitioner-Plaintiffs, | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | |
| JEH JOHNSON, Secretary of the | § | |
| Department of Homeland Security, | § | |
| ENRIQUE LUCERO, Field Office | § | |
| Director for Immigration and Customs | § | |
| Enforcement, LEON RODRIGUEZ, | § | |
| Director of U.S. Citizenship and | § | |
| Immigration Services, MARIO ORTIZ, | § | |
| San Antonio District Director for U.S. | § | |
| Citizenship and Immigration Services, | § | |
| and REYNALDO CASTRO, Warden of | § | |
| the South Texas Detention Center, | § | |
| | § | |
| Respondents-Defendants. | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART THE
GOVERNMENT'S MOTION TO DISMISS AND GRANTING PETITIONER'S
<u>PETITION FOR WRIT OF HABEAS CORPUS</u>

Before the Court is a Second Amended Petition for Writ of Habeas

Corpus filed by Petitioner Leonardo Villegas-Sarabia ("Petitioner") (Dkt. # 4) and

the Original Complaint filed by Petitioner and his father, Leonardo Villegas, Jr.

("Villegas, Jr.").[1]  Jeh Johnson, Secretary of the Department of Homeland Security

("DHS"); Enrique Lucero, Field Office Director for Immigration and Customs

Enforcement; Leon Rodriguez, Director of U.S. Citizenship and Immigration

Services ("USCIS"); Mario Ortiz, San Antonio District Director for USCIS; and

Reynaldo Castro, Warden of the South Texas Detention Center (collectively, the

"Government") have filed a Motion to Dismiss (Dkt. # 13).  The Court held a

hearing on the Petition and the Motion to Dismiss on August 6, 2015.  At the

hearing, Lance E. Curtright, Esq., represented Petitioner.  Assistant United States

Attorney Gary L. Anderson and Lindsay C. Dunn, Esq., represented the

Government.  After careful consideration of the Petition and the memoranda

supporting and opposing the Government's Motion to Dismiss, the Court, for the

reasons that follow, **GRANTS IN PART AND DENIES IN PART** the

Government's Motion to Dismiss, **DECLARES** that the physical presence

requirements under 8 U.S.C. § 1409, as that statute applied at the time of

Petitioner's birth, violate the Constitution's guarantee of equal protection under the

Fifth Amendment, and **GRANTS** Petitioner's Petition for Writ of Habeas Corpus.

---

[1] The habeas claim and the claims for declaratory and injunctive relief were
separated into two actions following the Magistrate Judge's February 18, 2015
show cause order.  (Dkt. # 3.)  The Court subsequently found that the claims
should not have been separated, and ordered them consolidated on July 30, 2015.
(Dkt. # 23.)  Both the Second Amended Petition for Writ of Habeas Corpus filed
by Petitioner (Dkt. # 4) and the Original Complaint filed by Villegas, Jr. and
Petitioner in civil action number 5:15-cv-160 (Dkt. # 1) are now before the Court.

<u>BACKGROUND</u>

The parties do not dispute the relevant facts of this case.  Petitioner was born in Mexico on March 16, 1974.  ("Am. Pet.," Dkt. # 4 ¶ 20.)  Petitioner's father, Leonardo Villegas, Jr. ("Villegas, Jr."), was born in Eagle Pass, Texas, on August 10, 1955, and is thus a United States citizen by birth.  (<u>Id.</u> ¶ 17; Dkt. # 13-2, Ex. G.)  Villegas, Jr. lived in the United States continuously from his birth in 1955 through 1960, and from 1965 to the present.  (Am. Pet. ¶ 17.)  Petitioner's mother is a citizen of Mexico.  (<u>Id.</u> ¶ 19.)  Petitioner's parents were not married at the time of his birth.  (<u>Id.</u> ¶ 21.)  A few months after his birth, Petitioner moved with his parents to the United States and subsequently obtained lawful permanent resident status on July 11, 1985, at the age of 10.  (<u>Id.</u> ¶ 24; Dkt. # 14 at 2.)  Petitioner's parents married when Petitioner was 13, and Petitioner was "legitimated" by virtue of their marriage.  (Am. Pet. ¶ 22; Dkt. # 14 at 2; Dkt. # 13-7, Ex. G.)

On November 30, 2011, Petitioner was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922.  (<u>Id.</u> ¶ 25.)  Petitioner pled guilty on June 28, 2012, and was sentenced to 30 months imprisonment, with credit for time served since the date of indictment, on June 14, 2013.  (Dkt. # 13-2, Ex. B.)  Between his plea and his sentencing, Defendant filed an application for a certificate of United States citizenship with USCIS, claiming that he was a

derivative citizen through his father.  (Am. Pet. ¶ 26.)  USCIS denied Petitioner's

application on December 12, 2012, on the basis that Petitioner's father was 18

years old at the time of Petitioner's birth and thus could not have met the statutory

requirement that he have been physically present in the United States for ten years,

five of which must have been after the age of 14, prior to Petitioner's birth.  (Id.

¶ 27; Dkt. # 13-7, Ex. G.)  Petitioner filed a motion before USCIS to reopen the

decision on December 7, 2014; as of May 8, 2015, that motion remained pending.

(Dkt. # 14 at 2.)

On January 13, 2015, Petitioner was issued a Notice to Appear before

an immigration judge for removal proceedings and transferred to the custody of

DHS.  (Dkt. # 14 at 3.)  On January 21, 2015, Petitioner moved for reconsideration

of his bond status before the immigration court.  (Am. Pet. ¶ 33.)  The immigration

court held a custody redetermination hearing on January 29, 2015, at which the

immigration judge determined that Petitioner should be held without bond pending

his removal proceedings pursuant to 8 U.S.C. § 1226(c).  (Dkt. # 13-2, Ex. B; Dkt.

# 13-3, Ex. C; Dkt. # 13-4, Ex. D.)  Petitioner appealed the immigration judge's

denial of his motion for bond redetermination on March 23, 2015, arguing that he

was not subject to mandatory detention because he is a U.S. citizen under a

constitutional interpretation of the derivative citizenship laws.  (Dkt. # 13-5, Ex.

E.)  His appeal was denied by the Board of Immigration Appeals ("BIA").  (Dkt.

4

# 20 at 4 n.3.)  On May 28, 2015, the Immigration Judge issued an order that Petitioner be removed to Mexico, which remains pending on appeal to the BIA. (Dkt. # 17-1, Ex. A; Dkt. # 20 at 2 n.1.)  Petitioner remains in DHS custody.

On February 17, 2015, Petitioner and his father jointly filed an Original Complaint and Petition for Writ of Habeas Corpus.  (Dkt. # 1.)  In the Complaint and Petition, Petitioner claims that he is a United States citizen and therefore may not be detained under 8 U.S.C. § 1226(c), which provides for the detention of criminal aliens.  Petitioner and his father also seek (1) an injunction requiring the USCIS to issue a certificate of citizenship to Petitioner, and (2) a declaration that 8 U.S.C. §§ 1401 and 1409, as those statutes applied to them in 1974, are unconstitutional, and that Petitioner is a citizen of the United States.

On April 24, 2015, the Government filed a Motion to Dismiss.  (Dkt. # 13.)  After Petitioner filed a Response and the Government filed its Reply, the Court ordered the Government to file a supplemental response addressing Petitioner's equal protection claim.  (Dkt. # 16.)  The Government filed its supplemental briefing on June 10, 2015, and Petitioner filed a Response to the supplemental briefing on June 24, 2015.  (Dkt. ## 17, 20.)  Finally, Petitioner filed a notice of new case law on July 10, 2015, to which the Government responded on August 4, 2015.  (Dkt. ## 22, 24.)

DISCUSSION

In his habeas petition, Petitioner argues that his detention by DHS under 8 U.S.C. § 1226 is unlawful because he is a United States citizen. Petitioner's claim of citizenship is based on his argument that the physical presence requirements imposed on unmarried citizen parents of foreign-born children under 8 U.S.C. § 1409, as that statute applied at the time of his birth, unconstitutionally discriminate on the basis of gender in violation of the Fifth Amendment's guarantee of equal protection.[2]  Under § 1409(c), a child born abroad to an unwed citizen mother and a non-citizen father acquired citizenship at birth if the mother had previously been physically present in the United States for a continuous period of one year.  8 U.S.C. § 1409(c) (1974).  By contrast, under § 1409(a), which incorporates the physical presence requirements of 8 U.S.C. § 1401(a)(7), a child born abroad to an unwed citizen father and a non-citizen mother acquired citizenship at birth only if the father was previously physically present in the United States for ten years, five of which must have been after the

_____

[2] While the equal protection rights asserted in Petitioner's habeas petition are those of Villegas, Jr., who was subject to more demanding physical presence requirements in order to transmit his citizenship than those imposed on unmarried citizen mothers, both Petitioner and Villegas, Jr. are parties to this action. Villegas, Jr. has standing to raise his constitutional rights in his claim for declaratory relief, and the constitutional claim may therefore be considered by this Court.  See Nguyen v. Immigration & Naturalization Serv., 533 U.S. 53, 58 (2001).

age of 14.  8 U.S.C. §§ 1401(a)(7), 1409(a) (1974).[3]  Petitioner contends that this

gender-based difference violates equal protection, and that the appropriate remedy

is to extend the benefits of unmarried citizen mothers of foreign-born children

under § 1409(c) to unmarried citizen fathers.  Petitioner argues that under this

_____

[3] The statutes provided, in relevant part:

### § 1409. Children born out of wedlock.

(a) The provisions of paragraph[] . . . (7) of section 1401(a) of this title . . . shall apply as of the date of birth to a child born out of wedlock . . . if the paternity of such child is established while such child is under the age of twenty-one years by legitimation.
*     *     *
(c) Notwithstanding the provision of subsection (a) of this section, a person born . . . outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

Id. § 1409.

### § 1401. Nationals and citizens of United States at birth.

(a) The following shall be nationals and citizens of the United States at birth:
*     *     *
(7) a person born outside the geographic limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.

8 U.S.C. § 1401(a)(7) (1974).

constitutional interpretation of the statutes in question, he is a United States citizen, and his detention as an alien is therefore unlawful.

Additionally, both Petitioner and Villegas, Jr. seek a declaratory judgment that § 1409 is unconstitutional and that Petitioner is a citizen of the United States.  Finally, they seek an injunction requiring USCIS to issue Petitioner a certificate of citizenship.

I.     Jurisdiction

    A.     Habeas Petition

The posture in which Petitioner's claim is presented requires the Court to first determine whether it has jurisdiction to hear his habeas petition.  The REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 302, governs judicial review of administrative removal orders.  See Jean v. Gonzalez, 452 F.3d 392, 396 (5th Cir. 2006).  Under that statute, "the sole and exclusive means for judicial review" of a final order of removal is by filing a petition for review in the proper court of appeals.  8 U.S.C. § 1252(a)(1), (a)(5), (b)(9).  Such judicial review includes habeas corpus review under 28 U.S.C. § 2241.  Id. § 1252(a)(5), (b)(9).  The REAL ID Act does not, however, preclude habeas review of challenges to detention that are independent of challenges to a removal order.  See id. § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal

entered or issued under any provision of this Act." (emphasis added)); see also

Baez v. Bureau of Immigration & Customs Enforcement, 150 F. App'x 311, 312

(5th Cir. 2005) (non-precedential) (citing H.R. Rep. No. 109-72, at 300 (2005)

("[S]ection 106 would not preclude habeas review over challenges to detention that

are independent of challenges to removal orders.  Instead, the bill would eliminate

habeas review only over challenges to removal orders.")); Nadarajah v. Gonzalez,

443 F.3d 1069, 1075 (9th Cir. 2006) (holding that "the jurisdiction-stripping

provision of the REAL ID Act does not apply to federal habeas corpus petitions

that do not involve final orders of removal").

      Here, Petitioner is not challenging a final removal order.  Indeed,

there is no final removal order to challenge—Petitioner's appeal to the BIA of the

immigration judge's removal order remains pending, (Dkt. # 20 at 2 n.1), and an

order of removal appealed to the BIA does not become final until the BIA affirms

the order and dismisses the appeal, 8 U.S.C. § 1011(a)(47)(B); 8 C.F.R. § 1241.1.

Petitioner is instead challenging his detention by DHS, which has detained

Petitioner as a deportable criminal alien pursuant to 8 U.S.C. § 1226(c).  The

jurisdiction-stripping provisions of § 1252 therefore do not apply to Petitioner's

habeas petition, and the Court has jurisdiction to hear his habeas claim.

      The Government argues that Petitioner's habeas claim and his

removal proceedings are "inextricably linked," and that by "prejudging Petitioner's

citizenship in a habeas proceeding now, the Court could interfere with Petitioner's final order of removal later." (Dkt. # 17 at 3.) The REAL ID Act, however, does not prohibit district courts from "interfering" with final removal orders that have yet to issue. It instead vests exclusive jurisdiction to hear challenges to final removal orders in the appellate courts. Where a petitioner is not challenging a final removal order, § 1252 does not prohibit a district court from ruling on a habeas petition challenging the lawfulness of the petitioner's detention. The courts will not find habeas review foreclosed absent "a particularly clear statement" of intent from Congress. Demore v. Kim, 538 U.S. 510, 517 (2003). Finding no such statutory statement applicable here, the Court finds that it has jurisdiction over Petitioner's habeas petition.

B.    Declaratory and Injunctive Relief

As set forth above, in addition to Petitioner's habeas claim, Petitioner and Villegas, Jr. also seek a declaration that 8 U.S.C. § 1409, as that statute applied at the time of Petitioner's birth, is unconstitutional, and that Petitioner is a citizen. Petitioner and his father further seek an order requiring USCIS to issue a certificate of citizenship.

A person can affirmatively seek proof of citizenship by filing an application with USCIS under 8 U.S.C. § 1452(a). Rios-Valenzuela v. Dep't of Homeland Sec., 506 F.3d 393, 397 (5th Cir. 2007). If the application is denied and

the denial is affirmed on administrative appeal, he may seek a judicial declaration of citizenship under 8 U.S.C. § 1503(a).  Id.  Under that statute, "no [declaratory judgment] may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, in connection with any removal proceeding under the provisions of this chapter or any other act, or (2) is in issue in any such removal proceeding."  § 1503(a).

Section 1503(a)(2) thus bars actions seeking a declaration of citizenship where removal proceedings have already been initiated and the petitioner's citizenship is in issue in the removal proceedings.  Rios-Valenzuela, 506 F.3d at 397 ("[A] purported citizen may not initiate or begin a declaratory judgment action to establish his citizenship if it is already being litigated in a removal proceeding.").  Here, Petitioner and Villegas, Jr. brought their action for a declaration of Petitioner's citizenship on February 17, 2015.  (Dkt. # 1.)  Because Petitioner's removal proceedings were initiated on January 13, 2015, and Petitioner raised his citizenship claim as a defense in those proceedings, this Court is without jurisdiction to declare him to be a United States national, and for the same reason may not issue an order requiring USCIS to issue Petitioner a certificate of citizenship.  The Court therefore **DISMISSES** for lack of jurisdiction Petitioner and Villegas, Jr.'s claims for a declaration that Petitioner is a United States national and for an injunction requiring USCIS to issue a certificate of citizenship.

11

The jurisdictional bar of § 1503(a) does not, however, apply to Petitioner and Villegas, Jr.'s claim for a declaration that § 1409 is unconstitutional. By its terms, § 1503(a) applies only to an action by a person denied "a right or privilege as a national of the United States" "for a judgment declaring him to be a national of the United States." It does not act to bar a claim for a declaratory judgment regarding the validity of a federal statute under the Constitution, and the Court therefore has jurisdiction to decide Petitioner and Villegas, Jr.'s claim seeking a declaration that § 1409 violates equal protection and is unconstitutional.

## II.     Equal Protection

As discussed above, Petitioner's claim for habeas relief rests on his contention that 8 U.S.C. § 1409, as it applied at the time of his birth, violates the Fifth Amendment's guarantee of equal protection. Under that statute, an unwed citizen mother could confer citizenship on her child born abroad if she had been continuously physically present in the United States for one year at any time prior to the child's birth. § 1409(c). An unwed citizen father, by contrast, could confer citizenship on his child born abroad only if he had been physically present in the United States for a total of ten years prior to the child's birth. §§ 1409(a), 1401(a)(7). Additionally, five of the years of physical presence in the United States must have occurred after the father's fourteenth birthday. Id. Under this

latter requirement, an 18-year-old citizen father like Villegas, Jr. could not, by definition, transfer his citizenship to a nonmarital child born abroad.

Two appellate courts have considered whether this gender-based difference in an unmarried citizen parent may confer citizenship on his or her foreign-born children violates equal protection.  In United States v. Flores-Villar, 536 F.3d 990 (9th Cir. 2008), a panel of the Ninth Circuit held that the different physical presence requirements for unwed mothers and fathers to confer citizenship on a foreign-born child did not violate equal protection, finding that the physical presence requirements were substantially related to the important government interests of avoiding statelessness and assuring a link between the father, the United States, and the child born abroad.[4]  Id. at 996–97.  Recently, a panel of the Second Circuit came to the opposite conclusion, holding that the physical presence requirement unconstitutionally discriminated on the basis of gender.  Morales-Santana v. Lynch, — F.3d —, 2015 WL 4097296, at *12 (2d Cir. July 8, 2015).  The question is one of first impression in the Fifth Circuit.

A.    Standard of Scrutiny

While the Government's brief defends the challenged statute primarily on the basis that it satisfies the heightened scrutiny given to laws that discriminate

---

[4] The Supreme Court granted certiorari and affirmed by an equally divided court, United States v. Flores-Villar, 131 S. Ct. 2312, 2313 (2011), rendering the decision non-precedential, United States v. Pink, 315 U.S. 203, 216 (1942).

on the basis of gender, it also argues, in a footnote, that "the deferential review normally applied to congressional actions in the naturalization context should apply here."  (Dkt. # 17 at 4 n.4.)  Its latest supplemental brief also argues that the Court should apply rational basis review to Petitioner's claims.  (Dkt. # 28 at 2.)  The Court will therefore first consider the proper level of scrutiny to apply to Petitioner's equal protection claim.

In general, courts apply heightened scrutiny to laws that discriminate on the basis of gender.  United States v. Virginia, 518 U.S. 515, 531–33 (1996).  Such "skeptical scrutiny of official action denying rights or opportunities based on sex" reflects the nation's "'long and unfortunate history of sex discrimination.'"  Id. at 531 (quoting Frontiero v. Richardson, 411 U.S. 677, 684 (1973)).  In light of this history, "[p]arties who seek to defend gender-based government action must demonstrate an exceedingly persuasive justification for that action."  Id.

To withstand equal protection review, the State must show that "the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."  Id. at 533.  "The burden of justification is demanding and rests entirely on the State."  Id.  Additionally, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation.  And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of

14

males and females." Id.  "[T]he mere recitation of a benign, compensatory purpose is not an automatic shield which protects against any inquiry into the actual purposes underlying a statutory scheme." Weinberger v. Wiesenfeld, 420 U.S. 636, 648 (1975).

The Government's argument for a more lenient standard of scrutiny rests on the principle of judicial deference to government action related to immigration and naturalization.  The federal government "has broad, undoubted power over the subject of immigration and the status of aliens." Arizona v. United States, 132 S. Ct. 2492, 2498 (2012).  As the Supreme Court stated in Fiallo v. Bell, "[o]ur cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control."  430 U.S. 787, 792 (1977) (quoting Shaughnessy v. Mezei, 345 U.S. 206, 210 (1953)).  "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." Id.  As a result, the "scope of judicial inquiry into immigration legislation" is "limited." Id.

In Nguyen v. INS, 533 U.S. 53 (2001), the Supreme Court assumed, without deciding, that heightened scrutiny applied to an equal protection challenge of § 1409(a), which requires that a citizen father take affirmative steps not required of citizen mothers in order to transmit citizenship to a nonmarital child born

15

abroad.  Id. at 61.  In the appeal below, however, the Fifth Circuit held that Fiallo's lower standard of review did not apply.  Nguyen v. INS, 208 F.3d 528, 534–35 (5th Cir. 2000), aff'd, 533 U.S. 53 (2001).  The Fifth Circuit found that "there were significant differences between [§ 1409] which is challenged in the present case, and the INA statute challenged in Fiallo."  Id. at 535.  In particular, "the statute in Fiallo dealt with the claims of aliens for special immigration preferences for aliens, whereas the petitioner's claim in this case is that he is a citizen."  Id.  While recognizing that it had applied Fiallo in prior cases involving the claims of aliens, the Fifth Circuit found such cases distinguishable from the petitioner's claim of citizenship and applied heightened scrutiny.  Id.; cf. Malagon de Fuentes v. Gonzales, 462 F.3d 498, 503–04 (5th Cir. 2006) (applying rational basis review to a claim attacking "a congressionally-drawn distinction among aliens"); Rodriguez v. INS, 9 F.3d 408, 410 (5th Cir. 1993) (applying Fiallo limited review standard to alien's claim seeking waiver of deportation).

    Because the Supreme Court's Nguyen opinion affirmed the Fifth Circuit's decision, the Fifth Circuit's holding regarding the applicable standard of scrutiny remains binding on this Court.  As in Nguyen, Petitioner's claim here is that he is a citizen as of the time of his birth.  The challenged statute deals not with aliens' claims for immigration preferences, but with how citizen parents may confer citizenship on nonmarital children born abroad.  The Court therefore finds

16

that the Fifth Circuit's holding in <u>Nguyen</u> requires that heightened scrutiny be applied to Petitioner's claims.

The Court also notes that the Second Circuit held that heightened scrutiny applied to an equal protection challenge to the physical presence requirements in question here, rejecting the Government's argument that <u>Fiallo</u> limits the court's inquiry to rational basis scrutiny.  <u>Morales-Santana</u>, 2015 WL 4097296, at *5.  The Second Circuit, as did the Fifth Circuit in <u>Nguyen</u>, distinguished <u>Fiallo</u> on the basis that the laws challenged in that case governed the admission of non-citizens to the United States through a citizen parent.  While "the children's alienage [in <u>Fiallo</u>] implicated Congress's 'exceptionally broad power' to admit or remove non-citizens," the petitioner in <u>Morales-Santana</u> claimed "pre-existing citizenship at birth," and thus raised "no similar issue of alienage that would trigger special deference."  <u>Id.</u>

In addition to finding that the Fifth Circuit's holding in <u>Nguyen</u> governs the applicable standard of scrutiny here, the Court further finds its analysis, and that of the Second Circuit, to be persuasive.  Petitioner claims that under a constitutional interpretation of the challenged statutes, he is a citizen as of the date of his birth.  He is not challenging the denial of an application for immigration status or any other government action that could be said to implicate

the congressional "power to admit or exclude foreigners" at issue in <u>Fiallo</u>.[5]  430

U.S. at 796 n.6.  In its discussion of the scope of judicial review in cases

_____

[5] The Government argues that Petitioner's claim for citizenship is one of naturalization, and that Congress's sole authority to "establish a uniform Rule of Naturalization" under article I, section 8, clause 4 of the Constitution requires that the Court grant deference to the conditions for naturalization set by Congress.  The Government supplies no authority for its assertion, however, that "the power to confer or deny citizenship to individuals born abroad . . . is also an aspect of the power to exclude aliens."

Contrary to the Government's position, Congress did not view the conferral of citizenship by an unmarried citizen parent on a child born abroad to be a naturalization.  The parallel provision of the Nationality Act of 1940 appeared in Chapter II of that Act, titled "Nationality at Birth."  § 205, 4 Stat. at 1138, 1139–40.  The provisions pertaining to naturalization, by contrast, appeared in Chapter III: "Nationality Through Naturalization."  <u>Id.</u> at 1140.  Similarly, the parallel provision of the Immigration and Nationality Act of 1952 appeared in Chapter 1 of Title III, titled "Nationality at Birth and by Collective Naturalization." § 309, 66 Stat. at 238–39.  (The "collective naturalization" provisions conferred citizenship on certain persons born in the Canal Zone and the Republic of Panama, Puerto Rico, Alaska, Hawaii, the Virgin Islands, and Guam.  <u>Id.</u> §§ 302–07, 66 Stat. at 236–38.)  The provisions pertaining to naturalization generally were set out in Chapter III, "Nationality Through Naturalization."  <u>Id.</u> at 249.

The relevant provisions at issue here thus did not appear in the respective chapters of the 1940 and 1952 statutes setting out the provisions for naturalization, but in the chapters providing for "Nationality at Birth."  Additionally, § 205 of the 1940 Act and § 209 of the 1952 Act explicitly incorporate parts of §§ 201 and 301, respectively, which set out who "shall be nationals and citizens of the United States at birth."  § 201, 54 Stat. at 1138; § 301, 66 Stat. at 235.  The statutory structure of both Acts thus indicates that Congress considered conferral of citizenship by an unmarried citizen parent to a child born abroad to be the conferral of citizenship at birth, not a naturalization.

The Supreme Court has reached the same conclusion.  In <u>Rogers v. Bellei</u>, the Court noted that the foreign-born child of a married citizen mother "acquired citizenship at his birth."  401 U.S. at 818.  Significantly, the applicable statute at the time also required that the foreign-born child subsequently live in the United States for five years between the ages of 14 and 28.  <u>Id.</u> at 816.  The Court nevertheless recognized that the child was a citizen at birth under the statute,

concerning aliens, the <u>Fiallo</u> court expressly distinguished laws that apply to aliens from those that apply to citizens, noting that "in the exercise of its broad power of immigration and naturalization, Congress regularly makes rules that would be unacceptable if applied to citizens." <u>Id.</u> at 792 (quoting <u>Mathews v. Diaz</u>, 426 U.S. 67, 80 (1976)).  The laws challenged here apply to citizens, setting out the requirements for how citizen mothers and citizen fathers may confer citizenship on their nonmarital, foreign-born children where the other parent is a non-citizen.  The gender-based scheme provided for under the statutes must therefore satisfy the full rigor of the Constitution's guarantee of equal protection, and can be upheld only if the Government can show that it is substantially related to an important governmental interest.

      B.    <u>Governmental Interests and Tailoring</u>

        In defense of the statutes at issue, the Government argues that the gender-based difference in the physical presence requirements for transfer of citizenship by unmarried parents to a foreign-born child are substantially related to the important governmental interests of preventing statelessness among children born abroad and developing a tie between the child, the citizen parent, and this country.  The Court will consider each of these interests in turn.

characterizing his citizenship as "presumptive citizenship" subject to a condition subsequent.  <u>Id.</u> at 835.  The Court is therefore satisfied that Petitioner's citizenship claim here does not implicate Congress's powers over naturalization.

1.   Preventing Statelessness

The Government argues that the statutes at issue advance the important government interest of preventing statelessness.  The potential problem of statelessness arises out of the interaction of the United States' rule of <u>jus solis</u>, which assigns citizenship based on the place of birth (except as provided for by statute), and the rule of <u>jus sanguinis</u> adopted by many other nations, under which citizenship is acquired by blood relationship with a parent.  <u>See</u> <u>Rogers v. Bellei</u>, 401 U.S. 815, 828 (1971) (noting that the United States follows the rule of <u>jus solis</u> except as modified by statute); Brief for Respondent at 17–18, <u>Nguyen</u>, 533 U.S. 53 (No. 99-2071).  A child born out of wedlock abroad would be stateless if she was born in a <u>jus sanguinis</u> country and was unable to inherit the citizenship of either of her parents—for example, where a foreign country provided inheritance of citizenship from the mother, and no U.S. statute provided for transmission of citizenship by a citizen mother to a child born abroad.  <u>See</u> <u>Morales-Santana</u>, 2015 WL 4097296, at *9; <u>Runnett v. Shultz</u>, 901 F.2d 782, 787 (9th Cir. 1990).

The Supreme Court has recognized the harsh consequences of statelessness, <u>see</u> <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 160–61 (1967); <u>Trop v. Dulles</u>, 356 U.S. 86, 101–02 (1958), and both the Ninth and Second Circuits have recognized the prevention of statelessness as an important government interest in light of this precedent, <u>Flores-Villar</u>, 536 at 996;

20

Morales-Santana, 2015 WL 4097296, at *9.  Whether the prevention of

statelessness was in fact Congress's purpose in establishing the different physical

presence requirements at issue here, however, is doubtful.  As noted above, "the

court must inquire into the actual purposes of the discrimination, for 'a tenable

justification must describe actual state purposes, not rationalizations for actions in

fact differently grounded.'"  Nguyen, 533 U.S. at 76 (O'Connor, J., dissenting)

(quoting Virginia, 515 U.S. at 533).  The Government's argument with regard to

statelessness relies entirely on the Ninth Circuit's opinion in Flores-Villar, which

appears to assume without considering whether preventing statelessness in fact

motivated the physical presence requirement enacted by Congress.  See

Flores-Villar, 536 F.3d at 996–97.

       The provisions in question were first enacted in 1940, and marked the

first time that Congress had differentiated between children born out of wedlock

and children born to married parents in its jus sanguinis statutes.  Nationality Act

of 1940, ch. 876, § 205, 54 Stat. 1137, 1139–40; Brief for Professors of History,

Political Science, and Law as Amici Curiae Supporting Petitioner at 21,

Flores-Villar, 131 S. Ct. 2312 (2011) (No. 09-5801) ("Professors' Amicus Brief");

Kristin A. Collins, Illegitimate Borders: Jus Sanguinis Citizenship and the Legal

Construction of Family, Race, and Nation, 123 Yale L.J. 2134, 2136 n.2 (2014).

Section 205 of the Nationality Act of 1940 ("1940 Act") provided that, in the case

of a child born abroad to parents of whom only was a citizen, "citizen fathers and married citizen mothers could transmit citizenship to their child born abroad only after satisfying an age-calibrated ten-year physical presence requirement, but . . . unmarried citizen mothers could confer citizenship if they had resided in the United States at any point prior to the child's birth." Morales-Santana, 2015 WL 4097296, at *10 (emphasis in original); § 205, 54 Stat. at 1139–40 (incorporating § 201(g)). The Immigration and Nationality Act of 1952 ("1952 Act") retained this basic structure, but added an additional requirement that unmarried mothers have been continuously physically present in the United States for one year prior to the child's birth. Immigration and Nationality Act of 1952, § 309(c), 66 Stat. 163, 238–39.

The purpose of these statutes is best determined in light of their historical contexts. See United States v. Zacks, 375 U.S. 59, 62 (1963). From 1790 until 1934, foreign-born children acquired the citizenship of their father. Professors' Amicus Brief at 7 (citing Act of Feb. 10, 1855, ch. 71, § 1, 10 Stat. 604, 604; Act of Apr. 14, 1802, ch. 28, § 4, 2 Stat. 153, 155; Act of Jan. 29, 1795, ch. 20, § 3, 1 Stat. 414, 415; Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103, 104). Citizenship law throughout this period codified "the well-established norm of male headship in the marital family," under which "the husband determined the political and cultural character of his dependents—wife and children included." Id. at 7–9.

22

Women lacked the ability to transmit their citizenship to their children, and for
some of this period were even subject, by court interpretation and later by statute,
to the loss of their American citizenship upon marriage to a foreign husband.  Id. at
11–13; Collins, 123 Yale L.J. at 2156; Candice Bredbenner, A Nationality of Her
Own: Women, Marriage, and the Law of Citizenship 45–58 (1998)
("Bredbenner"); see also Miller v. Albright, 523 U.S. 420, 463–68 (Ginsburg, J.,
dissenting).

   The rule of paternal transfer of citizenship did not apply, however, to
children born outside of marriage.  While foreign-born children of married and
unmarried parents were not distinguished by statute prior to the 1940 Act, courts
and government agencies interpreted the statutes to refuse citizenship to nonmarital
children born abroad to citizen fathers.[6]  Collins, 123 Yale L.J. at 1258–60,
2182–83; Professors' Amicus Brief at 21.  This interpretation in part reflected
prevailing domestic relations law, which "generally insulated men from their
nonmarital children by disfavoring those children's claims to property and status"
and "resisted recognition of the father-child relationship outside of marriage."
Professors' Amicus Brief at 20–21.  Professor Collins persuasively argues that this
interpretation was also used as a facially neutral tool of racial exclusion.  See

---

[6] The State Department's practice provided an exception for nonmarital children
born abroad who were legitimated by the citizen father during the child's minority.
Collins, 123 Yale L.J. at 2183–84; Professors' Amicus Brief at 22.

Collins, 123 Yale L.J. at 1258–88.  In the historical context of expanding American empire, increasing Asian immigration, and anti-miscegenation laws, "restriction of father-child citizenship transmission outside the marital family regularly operated to exclude nonwhite children from citizenship."  Id. at 2158.

By contrast, judicial and administrative practice recognized the citizenship of nonmarital children born abroad to citizen mothers even before Congress provided for citizenship transfer by mothers to their children in 1934.  Id. at 1258–60, 2182; Morales-Santana, 2015 WL 4097296, at *10 (quoting To Revise and Codify the Nationality Laws of the United States Into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization, 76th Cong. 431 (1945)); Professors' Amicus Brief at 28–29.  The recognition of the mother-child relationship in the nonmarital context was a reflection of American common law, which recognized the mother-child relationship outside of marriage under the principle that "the mother in such a case stands in the place of the father," itself founded on the presumption that the mother was the natural caregiver.  Collins, 123 Yale L.J. at 2200–01; Professors' Amicus Brief at 27–29 & n.11; see also Nguyen, 533 U.S. at 91–92 (O'Connor, J., dissenting) (discussing history of legitimation requirement first enacted by 1940 Act); Miller, 523 U.S. at 463 (Ginsburg, J., dissenting).  Additionally, "[t]he historical sources suggest that administrators' recognition of mother-child

24

citizenship transmission outside of marriage was animated by the powerful

maternalist norms that shaped early twentieth-century social policy," which were

"premised on the view that mothers were the natural caregivers of children."[7]

Collins, 123 Yale L.J. at 2201.

The 1940 Act was originally drafted by a presidentially appointed

interdepartmental committee of officials from the Departments of State, Labor

(which housed the Bureau of Immigration), and Justice.  Id. at 2189, 2190–91.  The

drafters incorporated the existing administrative practice recognizing the

citizenship of nonmarital children born to citizen mothers and strictly limiting the

transmission of citizenship to children born to citizen fathers in the proposed law.

Id. at 2198, 2199–2200, 2205 (citing H.R. Comm. on Immigration &

Naturalization, 76th Cong., Report Proposing an Revision and Codification of the

Nationality Laws of the United States, Part One: Proposed Code with Explanatory

Comments (Comm. Print 1939) ("Proposed Code") at 17–18); Professors' Amicus

Brief at 25–26, 28–29.  As noted by Professor Collins, "the drafters of the

Proposed Code explained the recognition of unwed mothers' foreign-born children

---

[7] The maternalist justifications "largely originated in the practices of front-line
administrators in the Bureau of Immigration" dealing with crossings of the
Canadian-American border by mothers and their children.  Collins, Yale L.J. at
2201–04.  "Memo after memo explaining and defending the cross-border
agreement [between the United States and Canada] reveals U.S. officials' nearly
uniform view that it was only practical to keep mothers and their nonmarital
children [born abroad] together, as mothers were the presumed caretakers of such
children."  Id. at 2202–03.

as citizens using the formalized (and gender-based) logic of the common law: it was premised on the longstanding domestic relations law principle that 'the mother in such a case stands in the place of the father.'"  Collins, 123 Yale L.J. at 2200 (quoting Proposed Code at 18).

The exclusionary immigration policies of the first nearly two-thirds of the 20th century are also essential to a full understanding of the historical context of the 1940 Act.  Calls to allow women to transmit their citizenship to their foreign-born children were met with fears from administration officials and members of Congress that such a policy would result in an influx of immigrants who were otherwise excluded under racially-based immigration statutes.  Id. at 2192–96; Bredbenner at 232–33.  The requirement that a child born outside of the United States to one citizen parent live in the United States for five years between the ages of 13 and 21, enacted in the 1934 law that gave American mothers the ability to transmit citizenship and retained in the 1940 statute, Act of May 24, 1934, ch. 344, 48 Stat. 797; Nationality Act of 1940, ch. 876, § 201(g), 54 Stat. 1137, 1139, was intended by at least some legislators to exclude from citizenship "children of citizens who were otherwise racially excludable."  Collins, 123 Yale L.J. at 2194 (quoting the colloquy of Senators King and Copeland, 78 Cong. Rec. 8471 (1934)).  Similarly, the ten-year residency requirement in the 1940 Act was explained by a State Department official, in testimony before Congress on the

legislation, as an improvement over the 1934 law because "[i]t does not result in spreading citizenship over the face of the earth quite so much . . . among aliens," with explicit reference to citizens of "Chinese or Mexican descent."  To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization, 76th Cong. 40 (1945).

There is thus evidence that the differential treatment of citizen mothers and fathers with respect to the conferral of citizenship on nonmarital children born abroad stemmed from traditional gender roles embodied in American common law, the maternalist norms of policymakers, and a nativist desire to keep derivative citizenship from circumventing racially restrictive immigration policies. The Court has found no evidence, by contrast, that this gender classification was motivated by preventing statelessness.  The Second Circuit, in considering whether preventing statelessness was a genuine justification for the different physical presence requirements at issue here, found that "[n]either the congressional hearings nor the relevant congressional reports concerning the 1940 Act contain any reference to the problem of statelessness for children born abroad," and that "[t]he congressional hearings concerning the 1952 Act are similarly silent about statelessness as a driving concern."  Morales-Santana, 2015 WL 4097296, at *10. While the issue of statelessness was raised with reference to other provisions of the

1940 and 1952 legislation, there is no evidence that is was a concern relative to the physical presence requirements for unmarried citizen mothers and fathers.  See Proposed Code at 20 (noting the prevention of statelessness as the purpose of a provision conferring U.S. nationality on children of unknown parentage found in an outlying possession of the United States); S. Rep. No. 82-1137, at 39 (1952) (explaining, with reference to statelessness, the elimination of a provision conditioning a citizen mother's ability to transmit her citizenship to a nonmarital child born abroad on the father's failure to legitimate the child before the child's 18th birthday); Collins, 123 Yale L.J. 2205 n.283 ("[I]n the many hundreds of pre-1940 administrative memos I have read that defend or explain recognition of the nonmarital foreign-born children of American mothers as citizens, I have identified exactly one . . . that mentions the risk of statelessness . . . as a concern.").

The Government has therefore not met its burden of showing that preventing statelessness was a genuine justification for the challenged classification.  Further, even if the prevention of statelessness did motivate the different treatment of physical presence requirements for citizen mothers and fathers, the Government has not shown that the classification is substantially related to that interest.  "[T]he availability of sex-neutral alternatives to a sex-based classification is often highly probative of the validity of the classification." Nguyen, 533 U.S. at 78 (O'Connor, J., dissenting); see also Wengler v. Druggists

Mut. Ins. Co., 446 U.S. 142, 151 (1980) (striking down a gender-based

classification where a gender-neutral approach would advance the goals of the

statutory scheme equally well); Orr v. Orr, 440 U.S. 268, 281–83 (1979) (same).

Here, gender-neutral alternatives would equally, if not better, serve the goal of

preventing statelessness in nonmarital children born abroad.

During the time leading up to the 1940 Act, statelessness was

recognized as a potential problem for the nonmarital children of both citizen

mothers and citizen fathers.  Professors' Amicus Brief at 33–36 (citing Catheryn

Seckler-Hudson, Statelessness: With Special Reference to the United States

(1934)).[8]  In 1933, Secretary of State Cordell Hull proposed legislation to the

chairman of the relevant House committee that would have granted citizenship to a

child born abroad out of wedlock to either an American father or an American

mother if there was "no other legal parent under the law of the place of birth," a

gender-neutral solution to the risk of statelessness for children of citizen mothers

and citizen fathers.  Morales-Santana, 2015 WL 4097296, at *11 (quoting Letter

from Sec'y Hull to Chairman Dickstein (Mar. 27, 1933)).  In the lead-up to what

would become the 1934 Act, Congress was twice presented with gender-neutral

bills that would have addressed the problem of statelessness with respect to

---

[8] Seckler-Hudson's work was later cited by the Supreme Court in its discussions of
statelessness in Mendoza-Martinez, 372 U.S. at 161 n.15, and Trop, 356 U.S. at
102 n.35.  See also Professors' Amicus Brief at 33 n.17.

mothers as well as fathers.  See Amendment to the Women's Citizenship Act of 1922, and for Other Purposes: Hearings on H.R. 14,684, H.R. 14,685, and H.R. 16303 Before the H. Comm. on Naturalization and Immigration, 71st Cong. 1 (1931); Relating to Naturalization and Citizenship Status of Certain Children of Mothers Who are Citizens of the United States, and Relating to the Removal of Certain Distinctions in Matters of Nationality: Hearings on H.R. 5489 Before the H. Comm. on Naturalization and Immigration, 72d Cong. 1 (1932).[9]

Congress and administration officials thus do not appear to have viewed the risk of statelessness as especially acute in the case of children born abroad to citizen mothers as opposed to citizen fathers.  The Government has presented no evidence that statelessness was in fact a greater concern in the context of children born abroad to citizen mothers.  Cf. Brief for Scholars on Statelessness as Amici Curiae Supporting Petitioner 8–15, 22–28, Flores-Villar, 131 S. Ct. 2312 (No. 09-5801) ("There is no support for the government's assertion that the risk of statelessness for non-marital children of U.S. mothers was or is much higher than for U.S. fathers of non-marital children born abroad, or indeed any higher at all.").

---

[9] Both bills included language to the effect that "Any child, whether legitimate or illegitimate, born out of the limits and jurisdiction of the United States, whose father or mother may be at the time of the birth of such child a citizen of the United States, is declared to be a citizen of the United States; but the right of citizenship shall not descend to any child whose father or mother had never resided in the United States previous to the birth of the child."  H.R. 14,684, 71st Cong. § 3 (1930); see also H.R. 5489, 72d Cong. (1931).

Even had this been the case, the Court can discern no reason why a gender-neutral alternative could not have addressed this concern as well, or indeed better, than the gender-based requirement.  As recognized at the time, a nonmarital child born to a citizen father in a <u>jus sanguinis</u> country in which citizenship is acquired through the father would be stateless if the child could not acquire the father's American citizenship.  Professors' Amicus Brief at 34–35 (citing Seckler-Hudson at 221, 224–25).  Applying § 1409(c)'s physical presence requirement for unmarried citizen mothers to unmarried citizen fathers would thus advance the goal of preventing statelessness of citizen mothers' children equally well while further advancing that goal with respect to the children of citizen fathers.

Given the availability of gender-neutral alternatives that would advance the goal of preventing statelessness equally well or better than the gender-based physical presence requirements at issue here, the Court finds that the physical presence requirements are not substantially related to the achievement of the objective of preventing statelessness in children born abroad.  As a result, even if the prevention of statelessness did in fact motivate Congress's passage of the physical presence requirements for citizen mothers and fathers to transmit their citizenship to nonmarital children born abroad, that interest cannot support the requirements' discriminatory treatment of unmarried citizen mothers and fathers.

2.     Ensuring a Connection to this Country

The Government also argues that the different physical presence requirements applied to citizen mothers and fathers is substantially related to the interest in "ensur[ing] some tie between this country and one who seeks citizenship."  (Dkt. # 17 at 7 (quoting Nguyen, 533 U.S. at 68).)  The Second Circuit found, and Petitioner has not contested here, that ensuring a sufficient connection between foreign-born children of parents of different nationalities and the United States is important and was actually contemplated by Congress in requiring some period of physical presence before a citizen parent could confer citizenship on a child born abroad.  See Morales-Santana, 2015 WL 4097296, at *7.

The Second Circuit, in analyzing whether the different residency requirements for unmarried fathers and mothers was substantially related to this interest, could "see no reason[] that unwed fathers need more time than unwed mothers in the United States prior their child's birth in order to assimilate the values that the statute seeks to ensure are passed on to citizen children born abroad."  Morales-Santana, 2015 WL 4097296, at *7.  This Court wholly agrees. The Court can think of no rational basis for the idea that an unmarried citizen father needs more time—indeed, ten times as many years—to absorb American values than an unmarried citizen mother.  The Court is equally unable to find a

reason why an unmarried citizen father requires five years of U.S. residence after the age of 14 to sufficiently assimilate American values, while an unmarried citizen mother's absorption of American values is considered sufficient even if her one year of residence occurred in her infancy.[10]

As it did before the Second Circuit, the Government here cites Nguyen as support for the proposition that the gender-based physical presence requirements are substantially related to ensuring an adequate connection between the child and this country.  In Nguyen, the Supreme Court rejected a challenge to the Immigration and Nationality Act's requirement that an unwed citizen father affirmatively legitimate a child born abroad, declare his paternity under oath, or obtain a court order of paternity in order to transmit his citizenship to the child. Nguyen, 533 U.S. at 62.  The Court recognized two important interests that supported the legitimation requirement: ensuring the existence of a biological parent-child relationship, and ensuring "that the child and the citizen parent have some demonstrated opportunity or potential to develop" a meaningful relationship. Id. at 62, 64–65.

As the Second Circuit explained, neither of these interests applies to the physical presence requirements at issue here.  First, the physical presence

---

[10] The Court notes that while the Ninth Circuit found that the residence differential furthers the objective of developing a tie between the child, his or her father, and this country, it provided no explanation for how it did so.  Flores-Villar, 536 U.S. at 997.

requirements do nothing to ensure that a biological parent–child relationship exists; that function is fulfilled by the separate requirement that unwed citizen fathers legitimate their foreign-born children.  See § 1409(a) (1974).  A father's physical presence in the United States for ten years instead of just one prior to his child's birth "would have provided no additional assurance that a biological tie existed." Morales-Santana, 2015 WL 4097296, at *7.  Second, the physical presence requirement similarly does nothing to ensure that the child and the citizen father have an opportunity to develop a meaningful relationship.  The length of time a citizen father spends in the United States prior to his child's birth abroad has no effect on the father's subsequent opportunity to establish a relationship with the child.  Requiring Villegas, Jr. to reside in the United States for ten years, including five years after his 14th birthday, rather than one year "would have done nothing to further ensure that an opportunity for such a relationship existed."  Id.

The analysis of whether the different physical presence requirements for unwed citizen mothers and fathers is substantially related to the interest in ensuring the opportunity to develop a meaningful relationship between the citizen parent and child is thus not governed by the Supreme Court's analysis in Nguyen. As noted by the Second Circuit, "unwed mothers and fathers are similarly situated with respect to how long they should be present in the United States . . . prior to the child's birth in order to have assimilated citizenship-related values to transmit to

34

the child." <u>Morales-Santana</u>, 2015 WL 4097296, at *8 (emphasis omitted).  The Court therefore finds that the interest in ensuring the opportunity to develop a meaningful relationship cannot support the gender-based difference in physical presence requirements for unwed citizen mothers and fathers.[11]  Lacking a substantial relationship to an important government interest, the different physical presence requirements violate the Fifth Amendment's guarantee of equal protection.[12]

C.   <u>Remedy</u>

Having found that the different physical presence requirements for unmarried citizen mothers and fathers in § 1409(c) and (a), respectively, violate

---

[11] In its latest supplemental briefing, the Government suggests that § 1409(c) also furthers the important governmental interest of ensuring that a foreign-born child would not be separated from its citizen mother, asserting that a citizen mother would otherwise have had to choose between returning to the United States without her child and remaining abroad with the child.  (Dkt. # 28 at 7.)  First, the Government has provided no evidence that Congress actually had such a consideration in mind when drafting the statute.  Second, the Government has not explained why an unwed citizen mother would be forced to make such a choice.  At the time of Petitioner's birth, the foreign-born child of a citizen mother could be admitted to the United States as a permanent resident, and the parent could then petition for the child's naturalization.  <u>See</u> 8 U.S.C. § 1433(a) (1974).

[12] The current form of § 1409, which retains the one-year continuous presence requirement for unwed citizen mothers and requires that unwed citizen fathers be physically present in the United States for five years, two after attaining the age of fourteen, 8 U.S.C. §§ 1409(a) & (c), 1401(g), is not before the Court.  The Court notes, however, that the current statute, insofar as it requires unmarried fathers to meet a more burdensome physical presence requirement than unmarried citizen mothers, suffers from the same constitutional infirmity as its predecessor.

equal protection, the Court must determine the proper remedy.  "[W]hen the right invoked is that of equal treatment, the remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  Heckler v. Mathews, 465 U.S. 728, 740 (1984) (quoting Iowa-Des Moines Nat'l Bank v. Bennett, 284 U.S. 239, 247 (1931)).  The remedy chosen must be consistent with congressional intent in enacting the law in question, and "should therefore measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." Id. at 739 n.5 (quoting Welsh v. United States, 398 U.S. 333, 365 (1970) (Harlan, J., concurring in the result)).  Provided that it does not violate the intent of Congress, "ordinarily, extension, rather than nullification, is the proper course . . . ."  Id. (quoting Califano v. Westcott, 443 U.S. 76, 91 (1979)).

        In its analysis of the proper remedy, the Second Circuit set out three options: (1) striking § 1409(a) and (c) entirely; (2) severing the one-year continuous presence requirement of § 1409(c) and requiring unwed citizen parents to satisfy the ten-year requirement if the other parent lacks citizenship; or (3) severing the ten-year requirement of § 1401(a)(7) as incorporated by § 1409(a) and requiring every unwed citizen parent to satisfy the one-year continuous presence requirement if the other parent is not a citizen.  Morales-Santana, 2015

36

WL 4097296, at *12.  The first option, which is not advocated by either Petitioner or the Government, is foreclosed by the 1952 Act's severability provision, which provides that "[i]f any particular provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act . . . shall not be affected thereby."  § 406, 66 Stat. at 281.  Given Congress's intent that an invalid provision not affect other provisions of the Act, and because § 1409(a) and (c) violate equal protection only in combination, only one should be severed.  See Morales-Santana, 2015 WL 4097296, at *12; see also United States v. Cervantes-Nava, 281 F.3d 501, 505 n.11 (5th Cir. 2002) ("Courts should select the severance option most compatible with the statute's original text and structure, because severance is based on the assumption that Congress would have enacted the remainder of the law absent the severed portion.").

       The Government argues for the second option, contending that the proper remedy is to apply the longer physical presence requirements applicable to unwed citizen fathers to unwed citizen mothers.  (Dkt. # 17 at 12.)  In support of this position, the Government argues that the one-year continuous presence requirement for unmarried citizen mothers is an exception to the ten-year requirement, applicable to married mothers, married fathers, and unmarried fathers, that must otherwise be fulfilled to transfer citizenship to a child born abroad to

parents of whom only one is a citizen.  See §§ 1401(a)(7), 1409(a), (c).[13]

According to the Government, extending the one-year requirement for unmarried

citizen mothers to unmarried citizen fathers would allow the exception to swallow

the rule.

While the Court would not characterize an extension of the one-year

presence requirement to unmarried fathers as "swallowing the rule," given that the

ten-year requirement would continue to apply to married mothers and fathers, the

Government's argument is not without merit.  The Court is not persuaded,

however, that Congress would have preferred to apply the ten-year presence

requirement to all unmarried citizen parents rather than extend the one-year

continuous presence requirement to unmarried citizen fathers.  As noted by the

Second Circuit, "the ten-year requirement for fathers and married mothers imposed

by Congress in 1940 appears to have represented a significant departure from

long-established historical practice."  Morales-Santana, 2015 WL 4097296, at *12.

---

[13] The Government also argues that Congress has continued to apply the longer
physical presence requirement applicable to married citizen parents of children
born abroad to unmarried citizen fathers, citing the 1986 amendments to the
Immigration and Nationality Act and various legislation proposed but not adopted
thereafter.  (Dkt. # 17 at 13.)  The relevant inquiry, however, is Congress's intent
in enacting the provisions and statutory scheme at issue in this case—the
Immigration and Nationality Act of 1952.  See United States v. New York, 505
U.S. 144, 186 (1992) (framing the question of severability as whether the
legislature that enacted the statute would have enacted the remaining provisions
absent the provision subsequently found invalid); Cervantes-Nava, 281 F.3d at 505
n.11 ("Courts should select the severance option most compatible with the statute's
original text and structure . . . ." (emphasis added)).

Until 1940, children born to one citizen parent and one alien parent were recognized as citizens if the citizen parent had resided in the United States for any length of time.[14]  See Rogers v. Bellei, 401 U.S. 815, 823–26 (1971) (reviewing the history of the derivative citizenship statutes).

   The ten-year physical presence requirement was created for the first time by the 1940 Act, and required that five of those years occur after the age of 16.  Nationality Act of 1940, § 201(g), 54 Stat. at 1139.  The 1952 Act added the one-year continuous presence requirement for unmarried citizen mothers, "a relatively minor change in the baseline minimal residency requirement applicable to all men and women prior to 1940" as well as to unmarried citizen mothers from 1940 to 1952.  Morales-Santana, 2015 WL 4097296, at *12.  Compare Nationality Act of 1940, § 201(g), 54 Stat. at 1139, with Immigration and Nationality Act of 1952, § 309(c), 66 Stat. at 238–39.  The 1952 Act also changed the age-based portion of the ten-year requirement so that the five years were counted from the age of 14, extending the possibility of citizenship to children born to 19-year-old unwed citizen fathers.  § 301(a)(7), 66 Stat. at 236.  It did, however, retain the

---

[14] As noted above, citizen mothers were unable to transmit their citizenship until 1934.  Under the 1934 Act, however, a citizen mother was able to transmit her citizenship to a child born abroad if she had resided in the United States for any duration.  Act of May 24, 1934, ch. 344, § 1993, 48 Stat. 797; see also Bellei, 401 U.S. at 823–26; Morales-Santana, 2015 WL 4097296, at *12.

ten-year residency requirement for married citizen parents and unmarried citizen fathers.[15]  Id.

The history of the provisions in question thus shows that while the residency requirement for transmission of citizenship to foreign-born children was satisfied by residence of any duration for much of the nation's history, Congress in 1952 chose to retain the ten-year requirement first provided for in the 1940 Act. The Second Circuit's examination of Congress's intent with respect to the physical presence requirements of the 1952 Act found that "[n]either the text nor the legislative history of the 1952 Act is especially helpful or clear."  Morales-Santana, 2015 WL 4097296, at *13.  Having conducted its own review of the legislative history of the 1952 Act, this Court agrees.  The House Report on the bill that became law noted only, with respect to the ten-year physical presence requirement, that the proposed legislation allowed service in the Armed Forces to count toward physical presence in light of the "many members of our Armed Forces serving abroad who have married alien spouses and have children born in foreign countries."  H.R. Rep. No. 82-1365, at 76 (1952).  The Senate Report similarly offered no explanation of the ten-year physical presence requirement beyond the computation of presence for Armed Forces serving abroad.  S. Rep. No. 82-1137,

---

[15] The 1952 Act further specified that the ten-year requirement was one of physical presence.  § 301(a)(7), 66 Stat. at 236.  The 1940 Act had used the term "residence," which was viewed as less precise.  § 201(g), 54 Stat. at 1139; S. Rep. 81-1515, at 713 (1950).

at 39 (1952).  The report of the Senate Judiciary Committee on its comprehensive study of the nation's immigration laws recommended the physical presence provisions that were subsequently enacted, but its only commentary on the relevant provisions was to note that the residence requirements for citizen parents of children born abroad "are confusing and difficult to administer and interpret."  S. Rep. No. 81-1515, at 713 (1950).  The hearings on the legislation provide no additional insight.  See Revision of Immigration, Naturalization, and Nationality Laws: Joint Hearings before the Subcomms. of the Comms. on the Judiciary, 82d Cong. (1951).

The Court next looks to the legislative history of the 1940 Act, whose physical presence provisions were "carrie[d] forward substantially" by the 1952 Act.  H.R. Rep. No. 82-1365, at 76 (1952).  The Senate Report's explanation of the legislation, under the heading "Further Restrictive Provisions," states:

> Under present law a child born outside of the limits and jurisdiction of the United States of one citizen and one alien parent becomes a citizen at birth, provided the citizen parent has resided in the United States before the birth of the child.  No prescribed period of residence in this country of the citizen parent is fixed.  Under the code the citizen parent must have resided in the United States preceding the child's birth for at least 10 years, 5 years of which must have been reaching the age of 16 years.  This restriction would prevent the perpetuation of United States citizenship by citizens born abroad who remain there, or who may have been born in the United States but who go abroad as infants and do not return to this country.  Neither such persons nor their foreign-born children would have a real American background, or any interest except that of being protected by the United States Government while in foreign countries.

41

S. Rep. No. 76-2150, at 4 (1940).  It thus appears that Congress intended the residence requirement enacted in 1940 to restrict the transmission of citizenship by citizen parents living abroad to those parents with "a real American background," acquired through extended residence in the United States, that would be conveyed to their foreign-born children.  Such intent would weigh against extending the one-year presence requirement for unmarried citizen mothers under the 1952 Act, which was itself more restrictive than its predecessor in the 1940 Act and could allow further transmission of citizenship by persons "who may have been born in the United States but who go abroad as infants and do not return to this country."

Several considerations temper the weight of this expressed intent. First, it was expressed by the 76th Congress in relation to the provisions of the 1940 Act, and thus can only indirectly inform what the 82nd Congress intended 12 years later when enacting the 1952 legislation.  While the residency requirements of the two statutes are largely similar, the 1952 Act also made significant changes, including removing the condition that an alien father fail to legitimate a nonmarital child born abroad before transmitting the mother's U.S. citizenship to the child; lowering the age after which five of the ten years of presence must have occurred from 16 to 14; and increasing a citizen mother's residency requirement from any duration to one year of continuous presence.  Nationality Act of 1940, § 201(g), 54 Stat. at 1139; Immigration and Nationality Act of 1952, § 309(c), 66 Stat. at

42

238–39.  While the last of these changes was more restrictive than the 1940 statute, the first two made it easier for both unmarried fathers and unmarried mothers to transmit their citizenship to their foreign-born children.  Because the legislative history of the 1952 Act provides no insight into the reasons for these changes or the physical presence requirements more generally, Congress's intent in enacting them in 1952 remains less than certain.

Second, the Court is mindful of the greater context in which the 1952 Act was passed.  As discussed above, there is a strong argument to be made that the physical presence requirements were motivated, at least in part, by a desire to "ensure the integrity of the racial bars and national origins quotas" that existed prior to, and were carried forward by, the 1940 Act.  Collins, 123 Yale L.J. 2191–96, 2206.  As of 1950, U.S. immigration law barred all immigration from a geographical zone that included "parts of China, all of India, Burma, Siam, the Malay States, a part of Russia, part of Arabia, part of Afghanistan, most of the Polynesian Islands, and the East Indian Islands."  S. Rep. No. 81-1515, at 368 (1950).  Other provisions declared certain peoples to be "racially ineligible for admission: Burmese, Japanese, Koreans, Malayans, Maoris . . . natives of New Zealand, Polynesians, natives of Tahiti, and Samoans."  Id. at 369.  Chinese immigration was prohibited from 1882 until 1943, when Congress added China to the race-based national quota system.  Id.  The 1952 Act, which repealed

43

provisions related to the barred zone and racial ineligibility, still retained the racially restrictive quota system.  Immigration and Nationality Act of 1952, §§ 201–207, 66 Stat. at 175–81; see also Presidential Veto Message, H.R. Doc. No. 82-520, at 2–5 (1952); S. Rep. No. 81-1515, at 455 (1951).

Congress's intent with regard to the physical presence requirements must be viewed in light of this overall statutory scheme.  As noted above, the ten-year residency requirement in the 1940 Act was explained by a State Department official in testimony before Congress as an improvement over the 1934 law because "[i]t does not result in spreading citizenship over the face of the earth quite so much . . . among aliens."  To Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearing Before the H. Comm. on Immigration and Naturalization, 76th Cong. 40 (1945).  The official noted that as the law then existed, a U.S. citizen of Chinese or Mexican descent could "marr[y] a Chinese in China or a Mexican in Mexico, as the case may be, and they [could] have children" who "are born citizens of the United States."  Id. at 40–41.  Congressman Poage echoed the concern, noting that an American citizen "in my State could not marry a Chinese, but an American citizen can go abroad and marry a Chinese and bring her and all her children back to the United States and make them citizens."  Id. at 42.  Professor Collins has identified an abundance of further examples, outside of the specific context of physical

presence requirements, in which lawmakers voiced concerns that allowing a citizen mother to transmit her citizenship to children born abroad would result in extending citizenship to racially ineligible aliens. See Collins, 123 Yale L.J. at 2192–96 & n.237.

A law intended to restrict the ability of citizens to transmit their citizenship to their children on the basis of their race, even if facially race-neutral, raises serious equal protection concerns.  See Hunter v. Underwood, 471 U.S. 222, 232 (1985); Gomillon v. Lightfoot, 364 U.S. 339, 347 (1960).  Here, the history of the residence requirements for transmission of citizenship by a citizen parent to a foreign-born child, viewed in the context of the racially exclusionary statutory scheme of immigration of which those requirements were a part, strongly suggest that such restriction was at least one purpose of the ten-year physical presence requirement enacted in 1940 and carried forward in the 1952 Act.  Even if the 82nd Congress indeed intended that ten years of physical presence be the rule, rather than the exception, for citizen parents of foreign-born children, the Court hesitates to fashion an equal protection remedy based on a law that may itself violate equal protection.

Finally, assuming that Congress's intent was simply to ensure a sufficient connection between the citizen parent and the United States so that the parent would be able to pass on American values to a foreign-born child, the Court

45

is not persuaded that extending the one-year continuous presence requirement to unmarried citizen fathers would prove inconsistent with that intent.  Here, Villegas, Jr. has lived in the United States nearly his entire life, with the exception of five years during his childhood.  He was unable to transmit his citizenship to Petitioner not because he had not spent enough time in the United States prior to Petitioner's birth, but because Petitioner was born before Villegas, Jr. turned 19.  The citizen parents involved in court challenges to various aspects of the requirements for transmission of citizenship to foreign-born children have exhibited similarly strong ties to this country.  See, e.g., Brief for Petitioner at 4, Nguyen, 208 F.3d at 57 (No. 99-2071) (petitioner's father had lived in the United States continuously through early adulthood and brought petitioner to live in the United States when petitioner was six years old); Miller v. Albright, 523 U.S. 420, 425 (1998) (petitioner's father was a member of the U.S. military who conceived petitioner while on a tour of duty); Brief for Petitioner at 2–3, Flores-Villar, 131 S. Ct. 2312 (No. 09-5801) (petitioner's father had resided in the United States for 10 years prior to petitioner's birth and raised petitioner in the United States, but was only 16 when petitioner was born); Morales-Santana, 2015 WL 4097296, at *1 (petitioner's father was born and grew up in Puerto Rico, but left for the Dominican Republic 20 days prior to his 19th birthday); Cervantes-Nava, 281 F.3d at 502 (petitioner's mother was born and grew up in the United States, moved to Mexico at age 11, and

46

returned to work in the United States at age 19); Brief for Petitioner at 5,

Willkomm v. Holder, 341 F. App'x 281 (9th Cir. 2009) (unpublished) (No.

06-75631) (petitioner's father served in the Navy for 29 years and conceived

petitioner while on active duty); O'Donovan-Conlin v. U.S. Dep't of State, 255 F.

Supp. 2d 1075, 1077–78 (N.D. Cal. 2003) (citizen father had lived in Arizona for

his entire life except for periods of work abroad totaling of four years).  It thus

does not appear to the Court that extending the one-year continuous presence

requirement to unmarried citizen fathers of children born abroad would necessarily

result in transmission of citizenship by fathers "with no real American background,

or any interest except that of being protected by the United States Government

while in foreign countries."

        In light of these considerations, the Court finds that extension of the

one-year continuous presence requirement to unmarried citizen fathers is the

appropriate remedy for the equal protection violation here.  See Morales-Santana,

2015 WL 4097296, at *12–13; Heckler, 465 U.S. at 739 n.5 (noting that

"ordinarily, extension, rather than nullification, is the proper course").[16]

---

[16] The Court notes its conclusion regarding the proper remedy is consistent with
the Fifth Circuit's decision in United States v. Cervantes-Nava, 281 F.3d 501 (5th
Cir. 2002).  In that case, a criminal defendant challenged his conviction for illegal
reentry on the basis that he was a citizen, arguing that the different physical
presence requirements for the transmission of citizenship by married and
unmarried mothers violated equal protection.  Id. at 503.  The Fifth Circuit
assumed arguendo that the statute was unconstitutional and analyzed whether the

Importantly, this remedy does not amount to a grant of citizenship.  Under the

Court's analysis of the constitutionality of § 1409(a) and (c), Petitioner has always

been a United States citizen.  His claim is not that of "an alien who seeks political

rights as a member of this Nation," which may be obtained "only upon terms and

conditions specified by Congress."  INS v. Pangilinan, 486 U.S. 875, 884 (1988)

(quoting United States v. Ginsberg, 243 U.S. 472, 474 (1917)).  Petitioner instead

claims that he is a citizen as of his birth.  See Nguyen, 533 U.S. at 95–96

(O,Connor, J., dissenting) ("Petitioners . . . seek severance of the offending

provisions so that the statute, free of its constitutional defect, can operate to

determine whether citizenship was transmitted at birth.").  The Court's judgment in

his favor "confirm[s] [his] pre-existing citizenship"; it does not "grant [him] rights

that [he] does not now possess."  Miller, 523 U.S. at 432 (opinion of Stevens, J.).

---

defendant would be entitled to relief under the appropriate equal protection
remedy.

   The court found that severing the more stringent requirement of INA
§ 301(a)(7) would not eliminate the (assumed) unconstitutional distinction between
legitimate and illegitimate mothers because § 309(c) specifically benefits the
mothers of children born "out of wedlock."  Id. at 505.  To extend the shorter
residency requirement to married mothers, the court would have had to "rewrite
§ 309(c)."  Id.  The court thus found that severing § 309(c) would be the
appropriate remedy to cure the equal protection defect.  Id. at 506.

   Here, the Court need not "engage in legislative draftsmanship."  Id.  The
unconstitutional distinction here is between unmarried citizen fathers and
unmarried citizen mothers, and extension of § 1409(c) to unmarried citizen fathers
is not inconsistent with the "out of wedlock" language used § 1409.  It is enough to
sever the ten-year requirement of § 1401(a)(7) incorporated by § 1409(a) and
replace the term "mother" in § 1409(c) with its gender-neutral equivalent.  This
remedy is within this Court's remedial power.  See Califano, 443 U.S. at 92.

Absent the impermissible gender-based discrimination between unmarried citizen parents at issue here, Petitioner was a citizen as of his birth.

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Government's Motion to Dismiss, **DECLARES** that the different physical presence requirements imposed on unmarried citizen mothers and unmarried citizen fathers for transmission of citizenship to foreign-born children by 8 U.S.C. § 1409, as the statute applied at the time of Petitioner's birth, violates the Constitution's guarantee of equal protection under the Fifth Amendment, and **GRANTS** Petitioner's Petition for Writ of Habeas Corpus.

**IT IS SO ORDERED.**

**DATED:** San Antonio, Texas, August 17, 2015.

_____

David Alan Ezra
Senior United States District Judge